Filed 8/29/14  In re Cali S. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re CALI S. et al., Persons Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RAY S.,<br><br>    Defendants and Appellants. | A140514<br><br>(Contra Costa County<br>Super. Ct. Nos. J11-01741, J11-01742, J13-00509) |
| CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ROSE W.,<br><br>    Defendants and Appellants. | A140702<br><br>(Contra Costa County<br>Super. Ct. Nos. J11-01741, J11-01742, J13-00509) |

On December 11, 2013, the Contra Costa Juvenile Court terminated the parental rights of Ray S. and Rose W. as to three dependent daughters, the oldest aged six years and five months, and the youngest 19 months.  On these consolidated appeals, both Rose and Ray contend that no substantial evidence supports the court's finding that the

1

children were adoptable.  Rose further contends that the same lack of evidence infects the court's determination that Rose failed to establish that termination of her parental rights as to the eldest daughter would destroy the mother-daughter relationship that was beneficial to the daughter.  We conclude that these contentions are without merit, and affirm both orders.

## BACKGROUND

The dependencies were initiated in January 2012 when respondent Contra Costa County Children and Family Services Bureau filed petitions in which it was alleged that the two older children (J. and Cali) came within the scope of Welfare and Institutions Code[1] section 300, subdivision (b) by reason of Rose and Ray each having "a serious and chronic substance abuse problem," and Rose additionally having "an ongoing  issue of domestic violence with the father."  Both children were detained the next day.  Neither Rose nor Ray contested the allegations of the petitions, which were sustained in February 2012.  The following month the two children were declared dependents, placed in foster care, and provided reunification services.

The unreported six-month review was held in November 2012.  The case worker advised the court that "Both parents completed their [residential treatment] programs (both had ninety day stays) and have since found housing together.  Ms. [W.] gave birth to a baby girl [in May] and the couple with the baby is now living in Pleasant Hill.  The other two children are in foster care in Contra Costa County."  "Ms. [W.] would like to have her children returned to her care, but more work needs to be completed for relapse prevention.  She completed her parenting classes during her residential treatment program. . . .  [¶] . . . [¶] Ms. [W.] has provided negative [drug] tests consistently and has been informed that there cannot be missed tests."  All of Ray's drug tests so far had been negative, but he had missed some, and "he has been told that he should not miss any more."  Both Rose and Ray were told that they must "successfully . . . complete an

---

[1] Subsequent statutory references are to this Code unless otherwise indicated.

outpatient substance abuse treatment program," that they must test drug-free for six months, and that a missed test "will be considered positive."

The caseworker also reported that the oldest child, J., "has had a difficult time with the separation from her mother and because her previous foster placement had not obtained therapy for her even though they had been instructed to do so, the current caregiver will be taking care of that when she can get an appointment."

The caseworker assessed the situation as follows: "It would be easy to say that this couple are doing everything by the book and return their children to them at this time, but the fact is, that they need much more focus on staying on track with their sobriety which means that they cannot miss tests and they have to get to more meetings than feels comfortable or that they feel that they need. Both parents have completed other programs and have relapsed in the past and although they are not looking to blame others for their using, they have got to find the right tools that work for them consistently and that they will make them part of their lifestyle. . . . [¶] It would be naïve to believe that parents with a history of recovery and relapse will not be challenged to choose a different path even though they may fervently wish that it would just happen by some lucky chance. Sobriety is hard work and these parents, although they are on the right track at the moment, really have to prove that they are up to the challenge because of their history and more importantly, because they have these very young children. Relapse prevention is a must for both of these parents and they do need some extra time in order for that to become part and parcel of their daily lives."

In keeping with that evaluation, the caseworker recommended that reunification services continue to be provided, and that the two children continue as dependents and in foster care. The court accepted these recommendations.

On April 29, the court was about to hold the 12-month review when respondent filed a petition in which it was alleged that the newest daughter, C., should also be made a dependent because each parent "has a serious and chronic substance abuse problem," as evidenced by positive drug tests and missed tests that counted as positive tests. A new basis for dependency jurisdiction was that, under subdivision (j) of section 300, "The

3

child's sibling has been placed at risk and there is a substantial risk that the child will be neglected." C. was immediately detained.

Also at the April 29 hearing, in view of this latest development, respondent withdrew its recommendation that the two older children be returned to their parents' custody, and asked that all three children be considered together. Noting that the youngest child was less than 12 months old, and that the older daughters had been dependents for 16 months, and thus "the clock has already run" for them, the court declared itself "very concerned about these children." With counsel for Rose advising the court that jurisdiction for the youngest child would not be contested, all parties agreed for the next hearing to be expedited to May 13.

On May 13, both parents submitted on the issue of jurisdiction, and waived their "right to appeal a finding of jurisdiction," whereupon the petition concerning C. was sustained. The court made it clear to the parents that matters were coming to a head: "I am going to hold you to the timing, assuming I grant you reunification services to six months. This has gone on way too long as it relates to [the older children]. And I will not hesitate at the end of that time period to terminate services so that the Court can make a long-term placement for these children. It is in their best interest to have a stable and safe environment, whether it's with you or someone else. . . . [¶] . . . [T]he train is leaving the station, and you're either on it or you're off it."

Respondent was initially inclined to recommend a final six months of reunification services,[2] but both Rose and Ray repeatedly tested positive for amphetamine and methamphetamine in April and May, causing respondent to adopt a new approach: "The parents have exhausted the 18 month reunification period, and the Bureau respectfully recommends setting the 366.26 hearing to establish a permanent plan" for the two older children. July 18 was set as a combined hearing for the 18-month review of the two older children and the dispositional hearing for the youngest.

---

[2] Which had in fact already been mostly provided. The additional six-month period would end on June 29.

4

By the time of the hearing the court had received a disposition report in which respondent recommended that the youngest child join her sisters as a dependent, and that "reunification services be denied" to Rose and Ray because "the parents have relapsed after eighteen months of services." All three children "are placed together in a licensed foster home in Contra Costa County." Ray had not visited since the youngest was taken into custody at the end of April.

The caseworker's assessment was as follows: "After eighteen months of services, the parents have not sufficiently addressed their serious and chronic substance abuse which places their children at risk. Although the parents have completed numerous treatment programs[3] they have been unable to maintain sobriety. . . . [¶] The relapse prevention recommended by the undersigned Social Worker was apparently not effective (primarily because they failed to comply) and now these parents find themselves in the precarious position of being at the end of the legal time frame available to have their children returned to them. . . .

"There are some troubling aspects to all this. The oldest child misses her mother terribly, and asks the undersigned at each meeting if she will go home soon, and of course there is no answer that can be told to her. The two youngest children do not have that history with their parents, and may not have memory of this time in their lives, but they are missing that daily contact with the people who love them most of all. The parents have said that their efforts to remain clean appeared to be of no consequence when they were denied Family Maintenance services, and that is the rationale they used to miss tests and ultimately begin using drugs again even though they knew that using was going to push the limits of the time allotted to them. They never quite believed that they would have [C.] removed from their care. The Bureau is requesting that [C.] remain out of home, in placement with her sisters, and that no Family Reunification services be provided to her parents . . . so that a permanent plan can be made for [C.]"

---

[3] A total of five programs, three by Rose and two by Ray.

Rose testified at the July 18 hearing that for a week she and Ray had been enrolled in a newly-started residential treatment program. The programs and classes she was attending without her children allowed her to "focus[] more on myself, trying to really get to the core issue," and to "understand my actions and why I am in this situation and understand what needs to change in order to provide a healthy life for my children." She hoped to remain for at least 90 days.

Rose testified on cross-examination that, apart from marijuana, she has been drug-free since the end of May. Rose also admitted that marijuana use counts as a "relapse." Asked if she and Ray had "engaged in any domestic violence in the last six months," she acknowledged "There has been arguments that have gotten out of hand, yes," the most recent being at the end of June. In the past six months, she has thrown things at Ray "probably three or four" times under the influence of stress and methamphetamine.

Caseworker Simone Brooks testified that Rose had made diligent efforts "to find a residential program prior to getting into the current one she's in." Ray's efforts were just as "strident." Brooks acknowledged that as recently as February she was recommending that the two older children be returned to Rose and Ray, but that was before the parents relapsed and C. was taken into custody. The relapse was "extremely important" because of its timing—"they were so close to the end of time they had" for return of the children. Until the relapse, Rose and Ray had been in compliance with their case plans. And it was because of the relapse that an outpatient program was inadequate, which is why Rose and Ray had to re-do a residential treatment program. Brooks further testified that "there are adoptive homes available [for] a sibling group of three little girls," but no such home has been identified "that is willing to adopt . . . these specific three children."

The hearing was continued to July 23, at which time Ray, like Rose, testified that his relapse was attributable to the "overbearing" stress of "not having my children around," financial pressures of his underemployment and Rose's unemployment, and boredom. Ray believed the children "would benefit from additional time to reunify" because "we stay in contact with the foster mom" and the children. "[T]hey ask us the

6

same question every time, 'When can I come home?  When am I coming home?'  And I know in my heart that's what they want.  [¶] . . . [¶] . . . I'm doing everything I possibly can to be a better person, to be a better man, to be a better father."  Ray confirmed that "an incident of domestic violence" with Rose occurred on June 21.  He and Rose are "currently learning coping skills" to deal with their anger management problem.  Ray acknowledged he does not know all of the possible "triggers" of his drug use, but "[t]hat's exactly why I feel a little bit more help from the Bureau would go a long way."

After hearing argument, the court ruled as follows:

"You know, we're right back where we started from.  It is a very sad case.  We literally are right back where we started from.  The parents have admitted to some extent, although quite frankly I find their testimony to be rather self-serving and incredible in portions.  They've admitted to reverting back to acts of domestic violence and drug use.  And it's all intertwined together and that's exactly how this case started.  And I did have an opportunity to go back and look at a transcript from the proceedings in front of the Commissioner on November 8th of 2012 when he spent a great deal of time talking to the parents about missed tests and the slippery slope and the excuses here and there.  And he warned the parents, the clock is ticking.  Under the law you have 12 months [to reunify].  And he kept warning you that it was up to you, whether or not you are going to reunify with your children.  And he had a very straight discussion about the issues and they continued.

"And, quite frankly, I was somewhat taken aback by Ms. Brooks's testimony.  She was clearly emotionally invested in this case.  And I can understand how that happens.  However, I think it was her emotional investment that in some ways clouded her ability to objectively review the facts and the history in this case.  And I think it was her clouded judgment that caused her to recommend family maintenance, and she overlooked much of the parents' failures on that slippery slope.

"I thought Ms. Brooks was very candid and very honest.  And it was clear, she was crying from the witness stand, that she almost took it personally that these parents

relapsed because she had worked so hard with the parents. I think at some point her focus was a little off focus.

"The fact that these children are not in a concurrent home troubles me because this has been going on for so long. They should have been in concurrent placement, especially in light of these parents' history. And I agree there is absolutely no indication from either parent that they understand that they are the ones who have put themselves and their children in this position. It was not the removal of the children that caused this, it was not the fact that it was family reunification as opposed to family maintenance that caused this.

"You were drug addicts when you presented yourself to this Court initially and you continue to be drug addicts and you are using drug addicts. It has nothing to do with where these children are, whether they're in your care or not. And, in fact, you show they couldn't be in your care because you continue to use drugs and engage in acts of physical violence which creates life-long issues for children, period.

"Neither one of you when you testified showed any insight whatsoever, even though you have purportedly been engaged in services at one point or another. There is no insight. And why you choose to remain together to try to address these issues as opposed to apart to see if you cannot find sobriety, learn about domestic violence, stand on your own two feet before you attempt to stand together, I'm not sure. I wonder if there would have been more success if you had tried that.

"But this relationship is so dysfunctional and enmeshed in domestic violence and substance abuse, I'm not sure where one would begin to try to get you two to find sobriety. And it's very sad. It's very sad for the children.

"However, given the testimony, it appears that Cali, quite frankly, does not have a relationship with her parents. And I believe the parents pose a very serious risk to their children, very serious. It is clear to me from all of the evidence that they are nowhere near recovery, they are nowhere near the awareness it would take to get on that path of recovery, such that these children could in any near date be placed safely with the parents. And the law does not support making children wait for the parents to decide to

8

clean up their act, find sobriety and be safe with their kids. These are young children. They deserve permanency. And if it's not with you, then it will be with someone else who can give them a loving, stable safe home to live in. And I simply will not agree at this point to go right to long-term foster care for these children. I don't believe that's appropriate at all.

"And again, Ms. Brooks, she was very clear in her commitment to the parents. I want those children to be placed in a concurrent home immediately. [¶] . . .[¶] . . . They deserve it. They're entitled to it. And as I say, I believe it was Ms. Brooks's somewhat over-involvment. . . .

"And I find that Mother minimized her involvement in drugs as well. And it's clear by the missed test. And I know that I have warned the parents several times about missing tests. And yet they continue to miss tests and relapse and fail, quite frankly, in their case plans miserably.

"So for those reasons I am going to first adopt the recommendations . . . as it relates to [J.] and Cali."

"With respect to disposition of [C.], I am also going to follow the recommendation in this case, given what the siblings have been through and how long they have waited and the fact that the parents, quite frankly in the Court's mind, are right back to where they began, they've made absolutely no progress along the way here and given the testimony as it relates to the conduct in May and June of 2013. And even after the father left Salvation Army he admits he smoked marijuana and engaged in acts of domestic violence. So as I say, there is absolutely no progress whatsoever. I find that it would be clearly detrimental to make [C.] wait as her siblings waited. [¶] Rather, I think it most appropriate to set her matter for a .26 hearing, to bypass services so that she too may find permanence in her life."

On November 14, Rose filed a "Request to Change Court Order," specifically, the July 23 order terminating reunification services and setting a permanency planning hearing. Rose requested "resumption of reunification services and increased visitation.

9

The children to be transitioned back to Mother's care." The juvenile court summarily denied the request with this order:

"Mother's Request is DENIED for failure to state a change of circumstance. In addition, Mother's Request does not promote the best interest of the child.

"Mother states there is a change in circumstances because she is living in an interfaith housing apartment complex; enrolled in an outpatient substance abuse program October 22, 2013; has attended 17 twelve-step meetings; and obtained a sponsor on October 15, 2013..

"At best, Mother's Request showed *changing* circumstances. Mother has previously participated in three substance abuse programs and received eighteen months of services during [the pending] dependencies. Mother missed numerous tests, submitted suspicious samples (low Creatinine levels), and tested positive for methamphetamine and amphetamine on several occasions. Her recent pursuit of treatment and attendance of 12-step meetings is not sufficient to show a change in circumstances given Mother's long-standing substance abuse history. (Mother self-reported that she began using methamphetamine at the age of 12.) In fact, this recent activity does not support a finding of 'changing' circumstances in light of the history of this case and the issues that brought this family before the Court.

"Finally, Mother's Request fails to show that there is any change in circumstances relating to issues of domestic violence. Mother has a long history of involvement in relationships entrenched in domestic violence, including her relationship with [Ray] . . . . According to Mother's Exhibit A, she and [Ray] are currently living together.

"Given the ages of these children, the fact that eighteen months of services were provided to Mother yet she failed to reunify, and the fact that all children are placed together in a concurrent home, Mother's Request does not promote the best interest of the three children.

"For these reasons, Mother's Request to Change Court Order is DENIED."[4]

In her "366.26 WIC Report"[5] dated November 13, 2013, the new caseworker, Anne Dimas, recommended terminating Rose and Ray's parental rights. She concluded that Cali and C. "are young children with sweet personalities. They are currently placed in a concurrent foster home that is willing and able to adopt them. The children are adoptable." The same conclusion applied to J. She too "is an adoptable child" whom the prospective adoptive parents were "willing to adopt." The caseworker elaborated: "The prospective adoptive parents are a couple in their fifties who have been married for thirty-five years. They have five biological children, who are now adults, all of whom live close by and are close with the prospective adoptive parents. The prospective adoptive parents are also experienced foster and adoptive parents." Although this couple had only had custody of the children since October 19, they were apparently treated as "prospective adoptive parents" because they "have a completed and approved home study on file."

The caseworker noted in her assessments: "The parents continue to have a turbulent, at times, violent, relationship. The Bureau had high hopes for the parents' reunification with the children due to the fact that they came to the Bureau seeking help, were forthcoming about the problems that were placing the children at risk, and they seemed very willing to engaged in services. Nonetheless, after eighteen months of services, the parents were not able to sufficiently address their serious and chronic substance abuse problem, or keep from engaging in further domestic violence."

Concerning Rose and the oldest daughter: "The mother and [J.] do have a significant parent/child relationship. [J.] has yearned for her mother during the almost two years that she has resided in foster care. During this time the mother has visited, but has not provided [J.] with consistent daily care. The relationship that exists between the

---

[4] Many of these points were made in a memo opposing Rose's request from the caseworker to the court.

[5] Actually two reports, one for J., and one for Cali and C.

mother and [J.] is not enough to outweigh the sense of security and belonging an adoptive home would provide."

With respect to the other two children: "A relationship exists between the parents and the two children, Cali and [C.], however, it appears closer to a 'friendly visitor' relationship rather than a parent/child relationship. The parents have not been primary caregivers for Cali for almost two years. At [C.]'s very young age, she has quickly transitioned to creating a bond with whatever caregiver is providing her with daily care. The relationship that exists between the parents and the children, Cali and [C.], does not outweigh the benefits of legal permanency for the children."

Because all of the children were "adoptable children who are placed in a home that is ready and willing to adopt them," respondent recommended "the Court terminate the parental rights . . . and make adoption the permanent plan for the children."

After two continuances, the permanency planning hearing for the children was held on December 11, 2013. The hearing began with the court denying Rose's request to substitute new counsel, for the stated reason that "it would be detrimental to the interest of these children to continue to further delay these proceedings." The court then received in evidence the two reports prepared by respondent for the hearing, (see fn. 5 and accompanying text, *ante*), after which Anne Dimas, the caseworker who prepared the reports, testified as follows:

All of the children have been in a concurrent home since October 19. All have adjusted well to the new placement and seem happy with it. Dimas disagreed with former caseworker Brooks's statement in a June report that J. "misses the mother terribly": "[W]hen I spoke with her [J.] yesterday I asked her about whether she felt sad about missing her mom sometimes and she said that she did. And I asked her how often does she feel that way, and she said she feels that way about once a week. And I asked her what she does when she feels that way. And she says that she talks to her foster mom and that makes her feel a little bit better. It doesn't seem like she was feeling [any] anguish about it generally."

This questioning followed:

"Q. The . . . previous social worker stated that [J.] asked her at each meeting if she would go home soon with her mother. Has [J.] asked you that?

"A. No.

"Q. Never asked you that at all?

"A. No.

"Q. Has she told you she wants to be with her mother?

"A. No, she hasn't used those words. She's asked me when she was going to see her mother a couple times."

Dimas testified that she discussed adoption with J.: "[Y]esterday she asked me if she's going to be staying in the same home where she is until she's grown up, and I said I thought that she would and how did she feel about that. And she smiled and she said that she felt okay about being in that home until she was grown up." "I think she's been coming to understand that she's not going to be living with her mother. And I asked her whether she understood that, and she said that yes, she did. . . . I think that she knows that that's not a choice for her to live with her mom at this point. And given the choice, given the knowledge that she cannot live with her mom, she would like to live where she is." Still, the relationship between Rose and J. remains "significant," but it has "a negative aspect to it in the sense that it's been a source of disappointment for [J.]" Asked "Do you think [J.] would be harmed at all if that parental relationship is terminated?" Dimas replied: "I think [J.] is going to be harmed no matter what happens in this case." J.'s therapist believes "the best thing . . . at this point is to have permanency and stability in her life."

Dimas further testified that the relationship between Rose and the other children is not a significant one because "they don't see the mother as their caretaker or someone who's in their daily life or someone they depend on to get their needs met." The difference in the significance of the relationships is "due to the fact that [J.] is older than the other children. She spent a longer part of her life being taken care of by the mother. The little ones have lived for a much shorter percentage of their life with the mother as

13

their caretaker. And typically, younger children will bond and attach to another caregiver more quickly . . . due to their developmental stage."

Dimas testified Rose visits the children once a month, and the visits go well. The children do not cry when the visits end. J. refers to Ray as her father, but Cali refers to the current foster mother as "Mommy." Dimas admitted on cross-examination by Ray's counsel that J. had stated "she liked her current foster parents but she did not want to choose them over living with her mom," and that the children had been in their current placement less than 60 days.

When Rose's counsel asked "Can you tell me exactly how old they [the foster parents and prospective adoptive parents] are?" and whether their age warranted concern whether they could care for Cali and C., the court sustained respondent's relevance objections. Rose's counsel argued "I think it's relevant, how old potential adoptive parents are, whether they can take care of the children," but the court agreed when respondent's counsel stated "I was looking at case law earlier today and it says it's not."

According to Dimas, it was Rose who told her that Ray was using drugs in September 2013, and that "she had been using on and off since April." C. is being evaluated for "developmental disabilities," but Dimas maintained her opinion that "she's still an adoptable child." She reiterated that the current foster parents wish to adopt C. The children have a "close sibling relationship." "[T]hey are so close and connected that it would be in the best interest to remain together."

Rose and Ray each testified briefly. They objected to termination of their parental rights, firmly believing that the children would benefit from continuing the relationship, and would be harmed if it was terminated. Ray conceded the children's "need for stability is dire and it surpasses anything else right now . . . they feel comfortable . . . They're in good hands." Ray asked for guardianship for the youngest daughter.

After hearing argument, the juvenile court ruled as follows, beginning with whether there was an exceptional circumstance that warranted continuing reunification services:

14

"[T]here's really nothing exceptional here that would persuade the Court that the Court should delay any longer the permanency for these children.  These are parents who have been given services over a number of months.  And the history of usage of drugs is such that's it's clear to the Court that delaying this would not come to any different conclusion at the end of that, other than to delay even longer for these the opportunity to have permanency and a stable, loving safe home, which is what they deserve.

"And if you look at the statute, I have yet to find any evidence that's been presented here to the Court that I can find an exception.  All of these children I find by clear and convincing evidence are adoptable.  And I will not speculate that there may be evidence out there in the future that would indicate otherwise.  I have to make decisions based on what is presented to me today. . . .

"And I agree . . . that the testimony here with respect to Mr. [S.] as it relates to [J.] is really not relevant with respect to how the Court proceeds with selecting a long-term plan for [J.]  I do find that she continues to be a person described by Welfare and Institutions Code Section 300(b) . . . .  [¶] . . . I find by clear and convincing evidence that it is likely that she will that she be adopted.

"And I have to say, I thought Ms. Dimas's comments were profoundly right on the mark.  Whatever happens here today [J.] is going to be very sad.  And she's going to be sad because she loves her mom.  It's clear to me.  And mom loves her.  But we don't base our rulings limited on that love and disappointment.  We have to look at her well-being and stability and long-term care.  And although she may be sad by lack of contact and what this means today, I believe she ultimately will be very happy and that her well-being will best be served by proceeding as recommended . . . .  [¶] . . . [¶] I find that placement of the child continues to be necessary.  I find that her placement is appropriate.  I find that the permanent plan of adoption is appropriate for [J.] . . . ."

Concerning the younger children, the court ruled:

"As it relates to Cali and [C.], I hereby make the following findings:  I find that both children continue to be described by Welfare and Institutions Code Section 300(b),

15

and [C.] also is described by Welfare and Institutions Code Section 300(j). I continue both children as dependents of the juvenile court. [¶] . . . [¶]

"I find by clear and convincing evidence that it is likely that each of the children will be adopted. . . . [¶] I find that placement for each of these children is appropriate. And I hereby find that the permanent plan of adoption is the appropriate plan for each of these children."

## REVIEW

## Governing Principles

"The court has four choices at the permanency planning hearing. In order of preference the choices are: (1) terminate parental rights and order that the child be placed for adoption (the choice the court made here); (2) identify adoption as the permanent placement goal and require efforts to locate an appropriate adoptive family; (3) appoint a legal guardian; or (4) order long-term foster care. (§ 366.26, subd. (b).) Whenever the court finds 'that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption.' (§ 366.26, subd. (c)(1).) The circumstance that the court has terminated reunification services provides 'a sufficient basis for termination of parental rights unless the court finds a compelling reason for determining that termination would be detrimental to the child due to one or more' of specified circumstances. (*Ibid.*) The Legislature has thus determined that, where possible, adoption is the first choice. 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' [Citation.]" (*In re Celine R*. (2003) 31 Cal.4th 45, 53.)

"In order for the court to select and implement adoption as the permanent plan, it must find, by clear and convincing evidence, the minor will likely be adopted if parental rights are terminated." (*In re Tabatha G.* (1996) 45 Cal.App.4th 1159, 1164; see § 366.26, subd. (c)(1).) "Although a finding of adoptability must be supported by clear and convincing evidence, it is nevertheless a low threshold: The court must merely determine that it is 'likely' that the child will be adopted within a reasonable time." (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292.)

16

Adoptability is not necessarily a one-dimensional concept.  Generally, "[t]he issue of adoptability posed in a section 366.26 hearing focuses on the *minor,* e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor." (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649.)  It is not necessary that the minor already be in a potential adoptive home, or that there even be a prospective adoptive parent.  (*Ibid.*)  This is what has come to be called "general" adoptability.

" 'If the child is considered *generally adoptable*, we do not examine the suitability of the prospective adoptive home.  [Citation.]  However, where the child is deemed adoptable based solely on the fact that a particular family is willing to adopt him or her, the trial court must determine whether there is a legal impediment to adoption.' [Citation.]  [¶] . . . [¶] In other words, . . . 'in some cases a minor who ordinarily might be considered unadoptable [because of] age, poor physical health, physical disability, or emotional instability is nonetheless likely to be adopted because a prospective adoptive family has been identified as willing to adopt the child.' " (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1526, italics added.)  This is what has come to be called "specific" adoptability.

"All that is required is clear and convincing evidence of the likelihood that adoption will be realized within a reasonable time." (*In re Zeth S.* (2003) 31 Cal.4th 396, 406.)  Additionally, the prospect that the minors may have some continuing behavioral or developmental problems does not foreclose a finding of adoptability.  (See *In re Jennilee T.* (1992) 3 Cal.App.4th 212, 224–225.)

Although the juvenile court must find by clear and convincing evidence that the child is adoptable, we review a finding of adoptability for substantial evidence.  (*In re D.M.* (2012) 205 Cal.App.4th 283, 294, fn. 3; *In re E.B.* (2010) 184 Cal.App.4th 568, 578.)  "On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)  "[A]n

17

appellate court does not reassess the credibility of witnesses or reweigh the evidence. [Citation.] . . . Thus, we must uphold the juvenile court's factual findings if there is any substantial evidence, whether controverted or not, that supports the court's conclusion." (*In re S.C.* (2006) 138 Cal.App.4th 396, 415.) The presence of prospective adoptive parents is substantial evidence of adoptability. (*In re Sarah M.*, *supra*, 22 Cal.App.4th 1642, 1649-1650.)

"Section 366.26 provides an exception to the general legislative preference for adoption when '[t]he court finds a compelling reason for determining that termination would be detrimental to the child' (§ 366.26, subd. (c)(1)(B)) because '[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).) The 'benefit prong of the exception requires the parent to prove his or her relationship with the child 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' [Citations.] No matter how loving and frequent the contact, and notwithstanding the existence of an 'emotional bond' with the child, 'the parents must show that they occupy "a parental role" in the child's life.' [Citations.] The relationship that gives rise to this exception to the statutory preference for adoption 'characteristically aris[es] from day-to-day interaction, companionship and shared experiences. Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship.' [Citation.] Moreover, '[b]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement.' [Citation.]" (*In re K.P.* (2012) 203 Cal.App.4th 614, 621.) A juvenile court's decision on this issue is also reviewed for substantial evidence. (*In re Autumn H.*, *supra*, 27 Cal.App.4th 567, 576.)

18

## The Juvenile Court's Finding That The Children Are Adoptable Is Supported By Substantial Evidence

Within the context of contending that the termination orders are not supported by substantial evidence that any of the daughters were either generally or specifically adoptable, Ray and Rose present a number of related and overlapping arguments. They both argue that examination as to the prospective adoptive parents was improperly halted. Even without the information that examination would have yielded, Ray maintains there was a patent legal impediment to the prospective adoptive parents being able to actually adopt the children, meaning the children were not shown to be "specifically" adoptable. And Ray attacks as "unsupported" the caseworker's conclusion that the children were adoptable.

This last argument implicitly recognizes that, like any testifying witness, the social worker's opinion would ordinarily be accepted by itself as substantial evidence. (Evid. Code, § 411; *In re Casey D.* (1999) 70 Cal.App.4th 38, 53.) If Ray's argument means to undermine Ms. Dimas's qualifications to offer what amounts to an expert opinion, the point is lost for failure to object either to receipt of her reports as evidence or to challenge her qualifications during her testimony at the termination hearing. (Evid. Code, § 353, subd. (a); *In re Jennilee T.*, *supra*, 3 Cal.App.4th 212, 222–223.)

Moreover, the caseworker did not merely proffer a naked conclusion. Her reports discussed each child's individual situation in detail. She testified, on direct and cross-examination, about each child's condition. Undoubtedly the experience of Ms. Brooks made the court particularly disinclined to accept a caseworker's opinion without critical examination, yet no quibble was expressed about Ms. Dimas's conclusions on adoptability.

As for halting inquiry into the particulars of the prospective adoptive parents, as it has been said before: "As the court properly ruled, questions concerning the 'suitability' of a prospective adoptive parent are irrelevant to the issue whether the minors are likely to be adopted. . . . If inquiry into the suitability of prospective adoptive parents were permitted in section 366.26 hearings, we envision that many hearings would degenerate

19

into subjective attacks on all prospective adoptive families in efforts to avoid termination of parental rights. Such a result is not envisioned by the statutory scheme. Rather, the question of a family's suitability to adopt is an issue which is reserved for the subsequent adoption proceeding." (*In re Scott M*. (1993) 13 Cal.App.4th 839, 844.) On this point, judicial agreement is virtually complete. (*In re R.C*. (2008) 169 Cal.App.4th 486, 494; *In re Marina S*. (2005) 132 Cal.App.4th 158, 166; *In re T.S*. (2003) 113 Cal.App.4th 1323, 1326; *In re Sarah M*., *supra*, 22 Cal.App.4th 1642, 1650 & fn. 3) Thus, there was no error in the court precluding inquiry into the prospective adoptive parents.

As for Ray's argument that the foster parents do not qualify as prospective adoptive parents because they have not met one of the statutory criteria for that status,[6] the argument is misdirected and premature. It is misdirected because the designation here appears to be an internal one by Ms. Dimas, not the judicial designation intended by the statute, and the court made no such determination. It is premature because "the proceeding being appealed here was merely the preliminary step to adoption, in which parental rights were terminated and a permanent plan established. Only after this section 366.26 hearing are the children referred to the appropriate adoption agency for entertaining a petition for adoption." (*In re Diana G*. (1992) 10 Cal.App.4th 1468, 1481-1482.)

The uncontradicted opinion and testimony of Ms. Dimas that the current foster parents—who are fully aware of the particulars of the children's problems and difficulties —are willing to adopt all three amounts to substantial evidence that they were generally and specifically adoptable. (See *In re I.W*., *supra*, 180 Cal.App.4th 1517, 1526 [" 'A prospective adoptive parent's . . . interest in adopting is evidence that the child's age, physical condition, mental state, and other matters relating to the child are not likely to

---

[6] "[T]he court, at a hearing held pursuant to this section or anytime thereafter, may designate a current caretaker as a prospective adoptive parent *if the child has lived with the caretaker for at least six months*, the caretaker currently expresses a commitment to adopt the child, and the caretaker has taken at least one step to facilitate the adoption process." (§ 366.26., subd. (n)(1), italics added.) There is no dispute that, at the time of hearing, the children had not been in the current placement for six months.

20

discourage others from adopting the child.' "]; *In re Sarah M.*, *supra*, 22 Cal.App.4th 1642, 1650 ["a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family*."].)  If there was a legal impediment to any child's adoption, it was overcome by the prospective adoptive parents' willingness to take them all.

### The Juvenile Court's Finding That Rose Was Not Entitled To The Beneficial Relationship Exception For J. Is Supported By Substantial Evidence

Rose contends that hers is the "extraordinary case" where she demonstrated that "preservation of the parent's rights" should "prevail over the Legislature's preference for adoptive placement." (*In re K.P.*, *supra*, 203 Cal.App.4th 614, 621.)  Respondent appears to concede that Rose had sufficient constant visitation to satisfy the first requirement for the beneficial relationship exception.  The dispute is therefore confined to the second requirement, the so-called "benefit" criterion.

As previously mentioned, "[t]he 'benefit' prong of the exception requires the parent to prove his or her relationship with the child 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents,' " and to prove this " 'only after the court has repeatedly found the parent unable to meet this child's needs.' " (*In re K.P.*, *supra*, 203 Cal.App.4th 614, 621.)  In her brief, Rose's attorney does a commendable job of summarizing the evidence in the record favoring Rose.  But we cannot approach this issue de novo, but see it through the lens of substantial evidence review, namely, what supports the juvenile court's decision.  If we adopted any other attitude, we would be impermissibly reweighing the evidence.  (*In re S.C.*, *supra*, 138 Cal.App.4th 396, 415.)

The correct approach obliges us to accept that, although Rose has a deep and abiding attachment to J., an attachment that may well be reciprocated by J., this is not the sole, or even the primary factor.  A beneficial relationship is one that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would

gain in a permanent home with new, adoptive parents." (*In re Autumn H.*, *supra*, 27 Cal.App.4th 567, 575.) From an abundance of evidence the juvenile court concluded—as did caseworker Dimas—that Rose's devotion to J. was not stronger than Rose's inability to surmount her substance abuse dependency. The most recent demonstration of that inability was fresh in the court's mind: Rose's "relapse" less than two weeks before completing reunification. As the court correctly noted, with the termination of reunification services, the primary factor became J.'s need for permanency and stability. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317; *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 254.) The court also recognized " '[t]he reality is that childhood is brief; it does not wait while a parent rehabilitates . . . herself. The nurturing required must be given by someone, at the time the child needs it, not when the parent is ready to give it.' " (*A.H. v. Superior Court* (2010) 182 Cal.App.4th 1050, 1061, quoting *In re Debra M.* (1987) 189 Cal.App.3d 1032, 1038.)

"While reunification is the preferred outcome when it serves the interests of both parent and child, no interest is served by compelling . . . parents to shoulder responsibilities they are unwilling to accept or unable to discharge." (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1234.) With painful regret, the juvenile court agreed with Ms. Dimas and concluded that Rose was not up to the responsibility of raising J. in a drug-free environment. Further exposing J. to that danger was clearly not in her best interests. The record has more than ample substantial evidence to support that decision.

**DISPOSITION**

The orders are affirmed.

_____

Richman, J.


We concur:


_____

Kline, P.J.


_____

Stewart, J.